[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-12332

_____

ERIKA BUCKLEY,

Plaintiff-Appellant,

*versus*

SECRETARY OF THE ARMY,

Defendants-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 4:19-cv-00049-CDL

_____

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM and ABUDU, Circuit Judges.

ROSENBAUM, Circuit Judge:

Stealing patients and questioning the parentage of a colleague's children might sound like something out of *Grey's Anatomy*, the twenty-season television drama about the professional and personal lives of hospital staff[1]—not conduct expected at a local hospital in real life. Yet Erika Buckley, a Black woman and speech pathologist, alleges her former colleagues at Martin Army Hospital engaged in these sorts of antics and more because of her race.

Buckley, who left her job after being advised she was going to be dismissed, sued the Secretary of the Army under 42 U.S.C. § 2000e-16(a), the federal-sector provision of Title VII, alleging, among other claims, race-based disparate treatment, race-based hostile work environment, traditional retaliation, and hostile-work-environment retaliation. The Secretary moved for summary judgment, and the district court granted that motion on all counts. On appeal, Buckley contests the grant of summary judgment on these four claims. After careful consideration and with the benefit of oral argument, we affirm as to the retaliation claims. But we

---

[1] *Grey's Anatomy: Wishin' and Hopin'* (ABC television broadcast Feb. 1, 2007) (Izzie admits to stealing patients from the emergency room for the clinic); *Grey's Anatomy: Life on Mars?* (ABC television broadcast Mar. 12, 2020) (revealing the father of Amelia's baby).

vacate on Buckley's traditional-hostile-work environment claim and vacate in part on her race-based disparate-treatment claim.

## I.      FACTUAL BACKGROUND

Buckley is a Black woman.[2]  She worked as a speech pathologist for the Traumatic Brain Injury Clinic ("the Clinic") at Martin Army Hospital from 2010 to 2017.  The Clinic treated active-duty military members and their families for mild and moderate head injuries.  Buckley was the only speech pathologist and the only Black female provider at the Clinic.

The Clinic followed the Secretary's chain of command.  For Buckley, that meant she had two supervisors:  Major Yaoyao Zhu, her first-level supervisor, and Major John Miller, her second-level supervisor.  Major Zhu reported to Major Miller.

### A.      Problems at the Clinic

Buckley alleges that during her time at the Clinic, her supervisors and several other colleagues mistreated her.  Buckley's complaints of mistreatment fall into three major categories:  her colleagues (1) diverted white patients from her care; (2) drummed up complaints about her to justify their patient-diversion scheme and

---

[2] Because this is an appeal from an order granting summary judgment, we recite facts in the light most favorable to Buckley, the non-moving party, and we draw all reasonable inferences in her favor. *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1237 (11th Cir. 2021).

other mistreatment; and (3) engaged in other race-based harassing conduct.

We begin with the patient-diversion scheme. As part of his duties, Dr. Brian Ribeiro, a primary-care physician at the Clinic, referred patients for neuropsychological testing. In turn, Dr. Felix Ortiz, a neuropsychologist at the clinic, then referred some of these patients, including white patients, to Buckley for speech language therapy. Knowing Buckley's schedule, Dr. Ortiz thought that Buckley had the capacity to see all the patients he referred to her.

But after white patients had an initial consultation with Buckley, Dr. Ribeiro often asserted that the white patients had complained about her. Dr. Ribeiro used these complaints to justify referring Buckley's white patients to Robert Cooper, a white male occupational therapist at the Clinic, or to other off-base providers. Dr. Ribeiro never claimed that Black patients complained about Buckley, nor did he divert them from her care.

Because he had often treated and referred the patients himself, Dr. Ortiz was aware of the ethnicity of the patients who lodged complaints against Buckley. He noticed a "consistent" pattern in these patients. According to Dr. Ortiz, all of them had "the same traits": that is, they were about the same age, of the same "etnia,"[3] and flowed from the same primary physician, Dr. Ribeiro.

---

[3] We understand this term to refer to "etnia," a Portuguese noun that means "the fact of belonging to a particular ethnic group." *etnia*, CAMBRIDGE DICTIONARY (last visited Mar. 28, 2024)

And "[m]ultiple times," a patient he had referred to Buckley was later "sent off post" or "sent to occupational therapy without any other reason," against Dr. Ortiz's recommendation.[4]

To justify this patient-diversion scheme, Buckley alleges, Dr. Ribeiro and Ute Chavers, a nurse care manager, encouraged white male patients to complain about Buckley. To be sure, Buckley acknowledges that Clinic patients were often "argumentative, combative, and defensive" because of their brain trauma. But she asserts that Dr. Ribeiro and Chavers "enabled" or augmented

---

https://dictionary.cambridge.org/us/dictionary/portuguese-english/etnia [https://perma.cc/P79K-JZAJ].

[4] In the district court, the Secretary lodged a hearsay objection to Dr. Ortiz's testimony about Dr. Ribeiro's alleged diversion of patients from Buckley. The Secretary asserted that this testimony was hearsay because Dr. Ortiz's "knowledge [was allegedly] based on his conversations with Plaintiff, not his firsthand knowledge." On appeal, the Secretary does not raise any hearsay issues, so he has abandoned the issue. *See United States v. Campbell*, 26 F.4th 860, 871 (11th Cir. 2022) (en banc) ("Typically, issues not raised in the initial brief on appeal are deemed abandoned."). But in any case, Dr. Ortiz's testimony reflects that he knew firsthand of the flow of patients (including referrals) and participated in announcements and discussions about patient care at weekly team meetings. And as to the substance of the patient complaints, our precedent provides that a court may consider a hearsay statement if it can be reduced to admissible evidence at trial. *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). In this case, the patients identified by name in depositions could testify to the substance of their own complaints or the disparaging statements Dr. Ribeiro allegedly made to them about Buckley. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (considering whether identifiable witnesses had personal knowledge of alleged racial statements when deciding whether hearsay could be reduced to admissible form at trial).

negative patient perception of Buckley.  In particular, Buckley alleges that the two made disparaging comments about her directly to white male patients.  For instance, Buckley asserts, Dr. Ribeiro told a patient that Buckley had "angry [B]lack woman syndrome" and that the patient "had to be careful" with her.  Buckley complains these remarks invoked a common and offensive stereotype about Black women.

Besides poisoning the well, Dr. Ribeiro and Chavers allegedly also solicited trumped-up patient complaints and maintained them, along with meeting memoranda, in detailed records about Buckley.  And they did this even though neither was Buckley's supervisor, neither had a duty to do so, and neither kept records on any other staff member at the Clinic.

So for instance, if a patient complained of "a bad experience" with Buckley, Chavers "would have them elaborate on why" and note their complaints in a personal memorandum and the patient's chart.  Rather than directing patients to follow the hospital's official complaint process, Chavers informed the chief and Dr. Ribeiro of the complaint.  Then, Dr. Ribeiro determined whether the patient's complaint warranted a second opinion or a referral away from Buckley's care.  Buckley learned of patient diversions at the weekly team multidisciplinary (known as "multi-D") meetings.  During these meetings, Clinic providers, including Dr. Ribeiro, Dr. Ortiz, Buckley, and her supervisors, met, discussed, and collaborated on patient care decisions.

21-12332                Opinion of the Court                7

Besides Chavers's notes, Dr. Ribeiro also kept memoranda on Buckley that he placed in her personnel file.  One memorandum, dated July 2014 and created by Dr. Ribeiro, described a conversation in which Dr. Ribeiro complained to Buckley that she had improperly disclosed a patient's protected health information by copying individuals outside the department on an email.  Dr. Ribeiro advised Buckley not to disclose protected health information to people outside the department again.  We refer to Dr. Ribeiro's warning as the "2014 HIPAA Warning" and to Buckley's activities that preceded that Warning as the "2014 HIPAA Incident."[5]

Despite Dr. Ribeiro's and Chavers's files on Buckley, no patient ever used the Clinic's formal complaint process to lodge a complaint against Buckley.  Still, the informal complaints Dr. Ribeiro and Chavers collected led to a noticeable decrease in Buckley's patient load compared to those of her colleagues, particularly Cooper.  They also caused Buckley to be "on pins and needles all the time" with her patients because she believed that Dr. Ribeiro and Chavers had predisposed them to give her a hard time and complain.  According to Dr. Ortiz, during multi-D team meetings, the complaint-referral practice came up as "an ongoing area of concern," and the situation was shared with Major Zhu.  Buckley also

---

[5] As relevant here, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936, generally prohibits disclosure of patients' private healthcare information to anyone other than the patient and her authorized representatives, unless the patient consents.

testified in her deposition that she complained to Majors Miller and Zhu about the practice.

Aside from the patient-diversion and complaint-solicitation schemes, Buckley alleges other mistreatment. At weekly multi-D meetings, for instance, Buckley says Dr. Ribeiro acted dismissively towards her, interrupting her more than he did Cooper. And at a 2016 meeting of Dr. Ribeiro, Buckley, and a nurse, in which the group discussed a patient's scheduling conflict, Dr. Ribeiro stepped into the hallway to yell at Buckley. He raised his hands and said angrily, "[A]re you happy now, Erika?" The exchange left Buckley visibly shaken.

In another meeting that Major Miller, Dr. Ribeiro, Buckley, and Cooper attended, Cooper explained a plan to transition a cognitive skills-building group Buckley had created, to another provider. In characterizing the work involved in running the group, Cooper said that "a monkey could do that job." Dr. Ribeiro agreed, remarking, "Yeah, a monkey could do it." Major Miller, who was there for both comments, did not react to them. Buckley complains that these comments were racial slurs.

In yet another incident, in March 2017, because of a locked door, Buckley arrived a few minutes late for a meeting where she was scheduled to make a presentation. In front of the rest of the Clinic providers at the meeting, Major Zhu reprimanded Buckley. She said, "[Y]ou should have been here on time. Why didn't you have your stuff together[?] Didn't you know we were having this meeting?" Buckley felt humiliated, and she could not recall

another instance when a provider was reprimanded in front of the entire department for being late. In Buckley's view, Major Zhu's reprimand invoked the "colored people time" stereotype that Black people are late, and that the comment reflected racial animus.

And one day in Buckley's office, Major Zhu, referring to a photograph of Buckley's children, asked Buckley whether her children had the same father. Buckley complained to Major Miller. But rather than taking action himself, Major Miller merely advised Major Zhu to address Buckley's concerns because of the chain of command.

Based on these events, Buckley filed four complaints with the Equal Employment Opportunity Commission ("EEOC"): one in December 2014 and three between January and November 2016. Dr. Ribeiro became aware that he was the subject of an EEO complaint in 2016, after the EEOC contacted him. Major Miller and Major Zhu also learned of Buckley's EEO activity, though at unspecified times. Dr. Ortiz noted that the complaint-referral pattern leading Buckley to receive fewer patients continued after Buckley's EEO activity.

### B.    Buckley's Removal

On April 25, 2017, Buckley emailed Major Miller, Major Zhu, Beverly Simmons (a civilian HIPAA officer under the Secretary), and Barbara Parker (Buckley's union representative who did not work for the Secretary), among others, about a particular patient's chart. Buckley's email complained that Chavers wrote a negative and false note about her in the patient's chart, and Buckley

asked that the note be removed. In support of her request, Buckley attached the note, including the patient's chart with the patient's medical information, to the email. Buckley conceded in her testimony that sending the information to Parker, a non-hospital employee, was a "mistake." We refer to this as the "First 2017 HIPAA Incident."

Later, Buckley visited her congressman's office to complain about the same negative note. She took "information" to his office, including the patient's medical information, and people in the office made copies of it. Buckley did not think that giving the patient records to the congressman was a HIPAA violation because it was protected whistleblower activity. We refer to this event as the "Second 2017 HIPAA Incident."

Simmons investigated the April 25th email for an alleged HIPAA violation. During the investigation, Major Zhu asked Simmons if she could "get" Buckley on a HIPAA violation. Majors Miller and Zhu also told Simmons that Buckley had already been investigated for a HIPAA violation, even though the 2014 HIPAA Incident did not result in an official investigation. In May 2017, Simmons determined that "a HIPAA violation [based on the April 25th email] cannot be substantiated."

In response, Majors Miller and Zhu spoke to Simmons's chief, Frederick Davis, an officer in the Secretary's Patient Administration Division. Simmons stated in an EEO hearing that in all of the HIPAA investigations she has done, she has "never seen management go after a staff member like they did" with Buckley.

About a month later, Anne Norfolk, who worked in legal, directed Simmons to change her finding to "substantiated" because Norfolk determined Simmons's original conclusion was incorrect and, in fact, Buckley had committed a HIPAA violation. Simmons changed the finding and sent her new conclusion to the chief, Davis. On June 1, 2017, Davis determined that the April 25th email constituted a "substantiated breach" of HIPAA.

Soon after, in June 2017, Major Zhu wrote a memorandum recommending that the Secretary remove Buckley from federal service for HIPAA violations. In support, she specifically noted the 2014 HIPAA Warning and Incident and the First 2017 HIPAA Incident. Major Zhu then wrote Buckley a letter informing her of her proposed removal from federal service, not sooner than 30 days from her receipt of the letter.

In response, Buckley filed her fifth EEO complaint, alleging that Majors Zhu and Miller had discriminated against her based on her race, among other protected characteristics, and that Major Zhu's proposal to remove her was retaliatory.

The next month, on August 17, 2017, Major Miller placed Buckley on administrative leave pending investigation into the Second 2017 HIPAA Incident. It didn't take long for Davis to find that Buckley had committed a second substantiated HIPAA violation when she gave a patient's medical information to her congressman. And by the first week in September, Major Zhu sent Buckley a letter in which she informed Buckley that she had proposed Buckley's removal from the federal service based on the HIPAA violations.

Buckley timely filed a written rebuttal to her proposed removal, and Major Miller heard her oral reply.

On October 19, 2017, Major Miller sustained Major Zhu's decision to remove Buckley from federal service based on the two substantiated HIPAA violations, which he noted also constituted violations of department regulations. Among other considerations, Major Miller found that Buckley's First 2017 HIPAA Incident was intentional because she knowingly included a union steward, Parker, on the email. He said he based her punishment—termination of employment—on the Department's "table of penalties." And though the table of penalties serves as only a guide to discipline, not a rigid standard, Major Miller asserted, Buckley's firing was consistent with the penalty the Department imposed on other employees "for similar offenses."

Major Miller's letter stated that Buckley's removal would be effective on October 21, 2017. Because she wanted to protect her professional license, Buckley instead resigned on October 20, 2017. The Secretary replaced Buckley with a Black woman in August 2018.

According to the Secretary's human-resources specialist, the Secretary disciplined ten Martin Army Community Hospital employees for HIPAA violations between 2014 and 2020. These individuals included both Black and white employees, and they were reprimanded, suspended, and removed for HIPAA violations. The parties have not provided details of the violations, their severity, or the decision-makers involved.

## II.     PROCEDURAL HISTORY

In 2019, Buckley sued.  As relevant here, Buckley alleged the Secretary (1) engaged in race-based disparate treatment; (2) retaliated against her for her protected activity by taking adverse personnel action against her; (3) retaliated against her for her protected activity by creating a hostile work environment; and (4) created a race-based hostile work environment.

After discovery, the Secretary moved for summary judgment on all of Buckley's claims.  The district court granted the Secretary's motion. *Buckley v. McCarthy*, No. 4:19-CV-49 (CDL), 2021 WL 2403447 (M.D. Ga. June 11, 2021).  On appeal, Buckley challenges the district court's rulings on the four claims we've identified above.[6]

## III.     STANDARD OF REVIEW

We review *de novo* a grant of summary judgment. *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010).  In conducting our review, we apply the same legal standards as the district court. *Id.*  That means we construe the evidence in the light most favorable to the non-moving party (Buckley). *Id.* at 1263–64. And if no genuine issue of material fact exists and the moving party

---

[6] Because Buckley made no arguments about her sex-discrimination claims on appeal, we consider them abandoned. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–83 (11th Cir. 2014).

(the Secretary) is entitled to judgment as a matter of law, we will affirm.  *Id.*; FED. R. CIV. P. 56(a).

The moving party is "entitled to judgment as a matter of law" when the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Showing a genuine issue for trial "requires more than speculation or a mere scintilla of evidence." *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1122 (11th Cir. 2014).  We may affirm summary judgment on any ground that the record supports.  *Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1277 (11th Cir. 2001).

## IV.    DISCUSSION

As we've noted, Buckley challenges the district court's grant of summary judgment on her claims for (1) race-based disparate-treatment; (2) race-based hostile work environment; (3) retaliatory personnel action for her protected EEO activity; and (4) retaliatory hostile work environment.  We discuss each claim, in turn, below.

## A.    Buckley submitted enough evidence to establish a race-based disparate-treatment claim, based on a theory that discrimination tainted the decision-making process.

Buckley sues over alleged race-based disparate treatment when she was a federal employee.  So her claim arises under 42 U.S.C. § 2000e-16(a), Title VII's federal-sector provision.  As relevant here, that statute provides that "[a]ll personnel actions

affecting employees . . . in military departments . . . shall be made free from any discrimination based on race . . . ."[7]  *Id.* § 2000e-16(a).

Recently, we analyzed this statutory text.  In *Babb v. Secretary, Department of Veterans Affairs*, we explained the breadth of the phrase "free from any discrimination."  992 F.3d 1193, 1199 (11th Cir. 2021) ("*Babb II*").  Relying on the Supreme Court's decision in *Babb v. Wilkie*, 589 U.S. 399 (2020) ("*Babb I*"), we said that "the 'free from any discrimination' language means that personnel actions must be made in 'a way that is not tainted by differential treatment based on' a protected characteristic."  *Babb II*, 992 F.3d at 1199 (quoting *Babb I*, 589 U.S. at 406).

That wording, we continued, "giv[es] special emphasis to 'two matters of syntax.'"  *Id.* (quoting *Babb I*, 589 U.S. at 406).  First, "'based on [race]' 'modifies the noun "discrimination,"' not 'personnel actions.'"  *Id.* (quoting *Babb I*, 589 U.S. at 406).  So to establish a violation of the statute, a plaintiff must show that race was "'a but-for cause of discrimination—that is, of differential treatment—

---

[7] The private-sector version of this provision appears at 42 U.S.C. § 2000e-2(a). Among other things, that statute makes it "an unlawful employment practice for an employer to" take personnel action against an employee or refuse to hire an applicant "because of such individual's race . . . ."  *Id.* § 2000e-2(a)(1). In other words, a violation requires a showing that race was the but-for cause of the challenged personnel action.  *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) (explaining that § 2000e-2(a)(1)'s "'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation"); *see Babb v. Wilkie*, 589 U.S. 399, 410 (2020) (describing "because of" as "but-for causal language").

but not necessarily a but-for cause of a personnel action itself.'" *Id.* (quoting *Babb I*, 589 U.S. at 406). And second, the phrase "free from any discrimination" modifies the verb "made." *Id.* (quoting *Babb I*, 589 U.S. at 406). So race discrimination cannot play any role in the way a federal-sector employer makes a decision. *Id.* Otherwise, race discrimination would taint the decision in violation of the statute. *Id.*

The upshot of these syntactical features is that the law "'does not require proof that an employment decision would have turned out differently if [race] had not been taken into account'—i.e., does not require that [race] discrimination be the but-for cause of an adverse personnel decision." *Id.* (quoting *Babb I*, 589 U.S. at 406). In other words, a federal employer violates the law if it allows race discrimination to contribute to any personnel action—even if the federal employer would have made precisely the same decision had it not engaged in race discrimination.

To clarify this concept, we riff on an example that the Supreme Court used in *Babb I*. *See Babb I*, 589 U.S. at 407. Suppose that a Black candidate and a non-Black candidate apply for the same position, and the federal employer assigns points to each application. In the first scenario, the non-Black candidate earns 90 points for her application, and the Black candidate earns 94, but the employer subtracts 5 points from the Black candidate's score because she is Black, so her total becomes 89. Then the employer hires the non-Black candidate. In that scenario, race is the but-for cause of the employer's failure to hire the Black candidate.

But suppose the non-Black candidate earns 90 points for her application and the Black candidate earns 85, and then the employer subtracts 5 points because the Black candidate is Black, so her total becomes 80. In that scenario, the employer has still violated § 2000e-16(a) because it allowed discrimination to factor into the decision-making process. But discrimination is not the but-for cause of the employer's failure to hire the Black candidate. Rather, even without the discrimination, the employer would have hired the non-Black candidate because her score was higher.

Yet even if a plaintiff proves that race discrimination tainted the decision-making process, she is not necessarily entitled to all remedies under § 2000e-16(a). Relief must redress the injury the race discrimination inflicted. *See Babb II*, 992 F.3d at 1205 n.8. After all, the law seeks to make a plaintiff whole. *See id.* So if an employer discriminates in the decision-making process but that discrimination is not a but-for cause of the employer's decision to, say, fire a plaintiff, that plaintiff cannot obtain the same remedies as a plaintiff whose employer wouldn't have fired her but for the employer's discrimination.

To put this point into more detailed terms, we return to the example of firing an employee. When discrimination is the but-for cause of an employee's firing, that employee may have a right to reinstatement, backpay, compensatory damages, and other forms of relief to address the wrongful firing. *Babb I*, 589 U.S. at 406. But when the federal employer discriminates in the decision-making process but the employee would have been fired, anyway, for a non-

discriminatory reason, the employee is not entitled to remedies like reinstatement and backpay. *See id.* After all, the court cannot place the plaintiff in a better position than she would have been in had the employer not discriminated against her. *See id.* Rather, the court must match any remedy to the specific injury. *See id.* So we've said that when discrimination is not the but-for cause of a personnel action, a court "should begin by considering 'injunctive or other forward-looking relief.'" *Babb II*, 992 F.3d at 1205 n.8 (quoting *Babb I*, 589 U.S. at 406).

Now that we've explored the standard for liability under Title VII's federal-sector provision, we consider whether the *McDonnell Douglas*[8] framework, which we often use to assess private-sector Title VII discrimination claims based on circumstantial evidence, continues to make sense in *Babb I* and *Babb II*'s wake. We conclude it does not.

The *McDonnell Douglas* framework is a burden-shifting framework. Under it, the plaintiff must carry the initial burden to establish a prima facie case of discrimination by showing that (1) she belonged to a protected class, (2) she experienced an adverse employment action, (3) she was qualified to perform her job, and (4) her employer treated similarly situated employees outside her class better. *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 (11th Cir. 2023). Once the plaintiff satisfies that burden, the burden shifts to the employer to give a legitimate, nondiscriminatory reason for its

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

actions. *Id.* If the employer does so, the employee must then show that the employer's stated reason was merely a pretext for unlawful discrimination. *Id.* In other words, under the *McDonnell Douglas* framework, the plaintiff bears the ultimate burden to show that discrimination was the but-for cause of her employer's adverse personnel action.

But as we've explained, Title VII's federal-sector provision does not require a showing of but-for causation to make out a violation. Rather, a federal-sector employee must show only that a protected characteristic played *any* part in her employer's process in reaching an adverse employment decision. So using the *McDonnell Douglas* framework for § 2000e-16(a) claims is like requiring the plaintiff to move a boulder when she need only push a pebble—in other words, the burden under *McDonnell Douglas* is heavier than Title VII imposes on a plaintiff in a federal-sector case. Indeed, we stated as much in *Babb II*, when we found that the Supreme Court apparently "accepted Babb's argument 'that the District Court should not have used the *McDonnell Douglas* framework'" in assessing her claim. 992 F.3d at 1204.

Instead, the framework is much simpler. In analyzing Buckley's disparate-treatment claim, we return to *Babb I*'s directive and simply assess whether Buckley has proffered evidence that her race "play[ed] *any* part" in the Secretary's decision-making process when he decided to remove her from federal service. *Babb I*, 140 S. Ct. at 1174 (emphasis added). We conclude that Buckley has identified sufficient evidence to allow a reasonable jury to find that race

played a role in the decision-making process. But she has not pointed to any evidence to establish that discrimination was the but-for cause behind the Secretary's proposed termination of her employment.

We begin with the evidence as it relates to the but-for cause behind Buckley's proposed removal. The Secretary offered a legitimate, nondiscriminatory reason for firing Buckley. Major Zhu and Major Miller said they proposed Buckley's employment termination because she had thrice disclosed private patient medical information in violation of HIPAA and Department regulations—including twice after being warned not to do so. And Buckley doesn't dispute that she made any of the three disclosures for which Major Zhu and Major Miller cited her. Nor does she assert that any of the three disclosures did not violate HIPAA or Department regulations. Not only that, but Buckley concedes that during the relevant timeframe, the Department disciplined—including by firing—other employees outside her protected group for the same infraction.

Buckley's reliance on Dr. Ribeiro and Chavers's conduct doesn't help her establish but-for causation, either. Buckley doesn't allege that either participated in the removal decision. And whatever else we can say about Dr. Ribeiro and Chavers's actions, we can't say they bear any direct connection to Majors Zhu and Miller, the supervisors that decided to remove Buckley. So Buckley has failed to raise a material issue of fact about whether race was the but-for cause of her proposed removal.

On the other hand, Buckley does point to some behavior by Major Zhu that could allow a reasonable jury to infer that race factored into the decision-making process along the way. In particular, during the investigation of Buckley's First 2017 HIPAA Incident, Major Zhu asked Simmons if she could "get" Buckley on a HIPAA violation. And after Simmons concluded that no HIPAA violation had occurred, Major Zhu went over Simmons's head to Simmons's chief to pursue a "substantiated" finding. So while a reasonable jury could infer that Major Zhu took HIPAA violations especially seriously, it could alternatively draw the reasonable inference that Major Zhu did not like Buckley and was out to get her.

That leaves the question as to why Major Zhu wanted Buckley dismissed. And that presents a jury question.

To be sure, after trial, a jury might find that Major Zhu wanted to get rid of Buckley because she had violated HIPAA or Major Zhu just found her hard to get along with or any number of other non-discriminatory reasons.

But Buckley asserts that Major Zhu knew of the race-associated patient-diversion scheme and did little to stop it. Buckley acknowledges that Major Zhu investigated one of Buckley's complaints that Chavers had put a false patient comment about Buckley into the patient's file. But Buckley complains that all Major Zhu did about it was to arrange for Chavers to undergo remedial training about writing notes in patients' charts. Otherwise, Buckley complains, Major Zhu did nothing to stop the race-associated patient-diversion scheme. And that's so, Buckley complains, even

though Major Zhu was a supervisor and could have put an end to the scheme.

On top of that, Major Zhu asked Buckley an odd question that arguably invokes a racial trope—about whether her children had the same father. Buckley asserts that this question dredged up a racial stereotype that Black women have children with multiple partners. We think a reasonable jury could reach the same inference. Indeed, a reasonable jury could infer that Major Zhu intended the reference to multiple fathers as a "racial insult" in the absence of any "benign explanation" for the question. *See Jones*, 683 F.3d at 1297 (reasoning that "the use of monkey imagery [was] intended as a 'racial insult'"). And that's especially so when we consider that Major Zhu also allowed the race-based patient-diversion scheme to continue.

Considering Major Zhu's stated intent to "get" Buckley, her allegedly race-based remark, and her failure to take more action to end the allegedly race-based patient-diversion scheme, we conclude that a reasonable jury could find that Major Zhu pursued Buckley's HIPAA violation so vigilantly at least in part because of Buckley's race. If a jury so found, then race tainted the decision-making process (though it was not a but-for cause of Buckley's proposed dismissal), and the Secretary violated § 2000e-16(a). We therefore vacate the district court's entry of summary judgment on Buckley's race-based disparate-treatment claim, but only as it relates to the Secretary's actions in the decision-making process that led to Buckley's dismissal.

**B.    The Secretary was not entitled to summary judgment on Buckley's race-based hostile-work-environment claim.**

To establish a hostile-work-environment claim based on race, a plaintiff must show five things: (1) she is a member of a protected class; (2) she experienced unwelcome harassment; (3) the harassment was race-based; (4) the harassment was "severe or pervasive enough to alter the terms and conditions of [her] employment and create a discriminatorily abusive working environment;" and (5) the employer is responsible for the environment under a theory of either vicarious or direct liability." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248–49 (11th Cir. 2014) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). Buckley has satisfied each of these elements.

First and second, Buckley is Black, and she did not welcome the harassment—including the patient-diversion scheme, the manufactured complaints about her, and the other harassment—she asserts she received.

Third, Buckley has submitted enough evidence to allow a reasonable jury to infer that the harassment she experienced was based on her race. For starters, Dr. Ribeiro and Chavers allegedly diverted only white patients, not Black patients, from Buckley's care. And they diverted these white patients to a white provider, Cooper. Not only that, but Dr. Ribeiro's comment during the alleged patient-diversion scheme, that Buckley was an angry Black woman, was expressly race-based. *See Banks v. Gen. Motors, LLC*, 81 F.4th 242, 272 (2d Cir. 2023) (finding that comments indicating

racial stereotypes, such as the "angry black woman," "can create an inference of discriminatory motive"). Plus, a reasonable jury could also find that Dr. Ribeiro's remark that even a monkey could do Buckley's job invoked a racial trope. *See Jones*, 683 F.3d at 1297 ("The use of the term 'monkey' and other similar words have been part of actionable racial harassment claims across the country.").

Fourth, the harassment was severe and pervasive enough to alter the terms and conditions of Buckley's employment and create a discriminatorily abusive working environment. The inquiry under this prong contains both an objective and subjective component. So Buckley must show both that a reasonable person would find the harassment to be sufficiently severe or pervasive, and that she subjectively found it to be so. *Adams*, 754 F.3d at 1249. We take each prong in turn.

In evaluating the objective severity of the harassment, we consider, among other factors, (1) how often the conduct occurs; (2) how severe the conduct is; "(3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. Although we evaluate these considerations, a plaintiff need not show any "single factor" to establish the objective component. *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1286–87 (11th Cir. 2018).

When we apply these considerations here, we conclude that the patient-diversion scheme and associated solicited complaints were objectively severe and pervasive. Dr. Ribeiro and Chavers

disparaged Buckley to her patients and solicited complaints about her to systemically divert white patients from Buckley's care to white providers. And they did so constantly. Both Buckley and Dr. Ortiz attested to Dr. Ribeiro and Chavers's pattern and practice of bad-mouthing Buckley to her white patients. Dr. Ribeiro and Chavers's scheme also drastically affected Buckley's job performance. Not only did it reduce her patient load, but it encouraged her patients to engage hostilely with her. Indeed, Dr. Ribeiro and Chavers sabotaged Buckley's ability to succeed with her white patients and undermined her entire position as a speech pathologist with the VA. A reasonable person would easily find this scheme humiliating and frustrating.

So it's no surprise that Buckley found the behavior hostile. As Buckley explained, Dr. Ribeiro and Chavers's conduct caused her to be "on pins and needles all the time" with her patients.

As to the fifth prong—liability—a reasonable jury could infer from the evidence that Buckley's supervisors knew about the harassment. *See Miller*, 277 F.3d at 1278 ("Actual notice is established by proof that management knew of the harassment."); *Smelter*, 904 F.3d at 1287 (imputing a supervisor's notice of racist comments, because he overheard them, to the company itself). Buckley protested to Major Miller many times about patient complaints being put in her file. And Dr. Ortiz and Buckley testified that Buckley advised Major Zhu of her "ongoing . . . concern" with patient diversion. When we draw all reasonable inferences in Buckley's favor, we conclude that a jury could reasonably find that Majors

Miller and Zhu knew of the race-based patient-diversion scheme and the drummed-up complaints.

Because Buckley has shown enough to make out a race-based hostile-work-environment claim, we vacate the district court's grant of summary judgment on that claim and remand for further proceedings on it.

## C.    The Secretary was entitled to summary judgment on Buckley's traditional retaliation claim.

Next, we address Buckley's traditional retaliation claim. Buckley asserts that the Secretary retaliated against her by proposing her termination because Buckley complained about racial discrimination.

We've held that § 2000e-16(a)'s prohibition of "any discrimination" also "directly 'bars reprisals against federal employees who file charges of discrimination.'" *Babb II*, 992 F.3d at 1203 (quoting *Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir. Unit A Mar. 1981)). That's so because "retaliation for complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)." *Id.*

As we've noted, § 2000e-16(a) generally requires federal-sector employers to make "[a]ll personnel actions" "free from any discrimination . . . ." 42 U.S.C. § 2000e-16(a). Because we've said retaliation falls within the category "discrimination" under § 2000e-16(a), that means that "[a]ll personnel actions" must be made "free from any" retaliation. So as with traditional race-based discrimination, if retaliation for engaging in a protected activity under Title

VII taints the decision-making process for any personnel action, that violates the federal-sector provision—even if the employer would have made the same decision absent retaliation. *Babb II*, 992 F.3d at 1202 (holding that *Babb I* displaced prior Eleventh Circuit precedent holding that the federal-sector retaliation claims require but-for causation).  But as we've explained, remedies must match the injury.  So remedies for a retaliation violation that tainted the decision-making process but were not a but-for cause of personnel action are limited just like they are for the analogous types of race-discrimination violations we've already discussed.

With this understanding in mind, we turn to the framework we've used in the past to assess retaliation claims.  Under that framework—a variation on the *McDonnell Douglas* framework—a plaintiff may establish a prima facie case of retaliation by showing (1) she participated in an activity that Title VII protects; (2) she suffered an adverse personnel action; and (3) a causal relationship exists between her protected activity and the adverse personnel action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  If the plaintiff makes out a prima facie case, the burden falls on the employer to state a legitimate, non-retaliatory reason for the challenged personnel action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the employer satisfies that burden, the plaintiff must carry the ultimate burden of proving that the employer's stated reason is pretext for retaliation. *Id.*

So just as with the traditional *McDonnell Douglas* framework for evaluating circumstantial race-discrimination claims, our prior

framework for assessing retaliation claims requires a plaintiff to prove that her employer wouldn't have undertaken the challenged personnel action against her but for its retaliatory motive. But as we've explained, retaliation in the decision-making process—even if it didn't affect the ultimate decision—still violates § 2000e-16(a).

So after *Babb I* and *Babb II*, in analyzing Buckley's retaliation claim, we instead consider whether Buckley has submitted evidence that would allow a reasonable jury to find that retaliation "play[ed] *any* part" in the Secretary's decision-making process when he proposed to remove her from federal service. *Babb I*, 140 S. Ct. at 1174 (emphasis added).

We conclude that she has not. To prove retaliation tainted her proposed removal, on appeal, Buckley relies on only the temporal proximity between her EEO complaints and her proposed termination. But seven months passed between Buckley's EEO complaint in November 2016 and her proposed removal in June 2017. And eight months went by between her November 2016 complaint and her proposed removal in July 2017. That is far too long to allow for the inference that retaliation infected the decision-making process that resulted in Buckley's dismissal. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (in the context of a but-for inquiry, holding that a period of three to four months, without more, is too long to establish an inference of

21-12332          Opinion of the Court          29

causation).  Without more, Buckley's traditional retaliation claim fails.[9]

**D.     The Secretary was entitled to summary judgment on Buckley's retaliatory-hostile-work-environment claim.**

A retaliatory-hostile-work-environment claim complains that the employer created or tolerated a hostile work environment in retaliation for an employee's participation in protected activity under Title VII.  So a retaliatory-hostile-work-environment claim is somewhat of a hybrid of a traditional protected-characteristic-based hostile-work-environment claim and a traditional retaliation claim.

But we have recognized that retaliatory-hostile-work-environment claims are "really . . . retaliation claims . . . rather than . . . 'hostile[-work]-environment' claims." *Babb II*, 992 F.3d at 1207.  For that reason, we use the retaliation standard—"whether the employer's complained-of action 'well might have dissuaded a reasonable worker from making or supporting a charge of

---

[9]  In her reply brief, for the first time, Buckley argues that the three months between her last EEO complaint (filed in July 2017) and her eventual removal (in October 2017) creates an inference of causation.  But that is too late.  An appellant cannot raise a new argument in her reply brief, so that argument is forfeited.  *Sapuppo*, 739 F.3d at 681, 683.  And even if we were to consider the argument, three months between the two events is still not enough, standing alone, to establish that a retaliatory motive tainted the decision-making process to remove Buckley.  *See Thomas*, 506 F.3d at 1364 (favorably citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), for the proposition that a three-month period is "insufficient").

discrimination'"—rather than the hostile-work-environment standard—"severe or pervasive"—to assess a retaliatory-hostile-work-environment claim.  *Id.* at 1207 (citations omitted).

One more note about the retaliatory-hostile-work-environment claim standard:  section 2000e-16(a) refers to only "personnel actions."  So to state a claim for retaliatory hostile work environment, a federal-sector plaintiff must establish that, to retaliate against her for engaging in protected Title VII activity, her employer created or tolerated a work environment that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" and that environment rose to the level of a "personnel action[]."  *Babb II*, 992 F.3d at 1207–09.

Buckley has not done so.  The district court granted summary judgment against Buckley on her retaliatory-hostile-work-environment claim for two independent reasons:  it found that (1) Major Miller, Major Zhu, and Dr. Ribeiro did not "engage[] in harassment that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination", and (2) Buckley cited no evidence "establishing a causal connection between her protected activity and the harassment." *Buckley*, 2021 WL 2403447, at *8.

We've already explained that we think Buckley sufficiently established that Dr. Ribeiro and Chavers created a hostile work environment for Buckley that rose to the level of a "personnel action."  In fact, we concluded that Buckley satisfied the traditional-hostile-work-environment claim's "severe or pervasive" standard.

And that standard is higher and more exacting than the "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" standard we apply in a *retaliatory*-hostile-work-environment claim.

But the evidence lends itself to only the inference that the hostile work environment was race-based, not retaliatory. So we agree with the district court that Buckley's retaliatory-hostile-work-environment claim fails on the independent ground of causation.

Buckley does nothing on appeal to challenge the district court's holding in this respect. So Buckley's appeal on this claim also fails because when a district court bases its order on more than one independent ground, a party must convince us "that every stated ground for the judgment against [her] is incorrect." *Sapuppo*, 739 F.3d at 680. If she doesn't challenge one or more bases for the district court's ruling, we consider her appeal of that ruling abandoned, and "judgment is due to be affirmed." *Id.* Just so here.

## V.    CONCLUSION

For these reasons, we affirm the district court's grant of summary judgment in the Secretary's favor on Buckley's traditional-retaliation and retaliatory-hostile-work-environment claims. And we affirm in part the district court's grant of summary judgment for the Secretary on Buckley's race-based disparate-treatment claim (namely, that race was not a but-for cause in Buckley's termination). But we vacate the district court's summary-judgment order on Buckley's hostile-work-environment claim, and we vacate

32　　　　　　　　　Opinion of the Court　　　　　　　21-12332

in part on her race-based disparate-treatment claim. Specifically, we vacate as to Buckley's theory that race discrimination tainted the decision-making process though not her removal. Finally, we remand for proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**