[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11143

Non-Argument Calendar

_____

ANYA WEATHERLY,

Plaintiff-Appellant,

*versus*

ABC LEGAL, INC.,
ABC LEGAL SERVICES, INC.,
a Washington Corporation,
ABC LEGAL SERVICES LLC,
a Florida limited liability company,
ABC LEGAL SERVICES LLC,
a Washington limited liability company,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-23678-DPG

_____

Before ROSENBAUM, NEWSOM, and ANDERSON, Circuit Judges.

PER CURIAM:

Anya Weatherly appeals the district court's grant of summary judgment in favor of her former employer, ABC Legal, on her claims of race and national-origin discrimination and retaliation, and its dismissal of her claims for hostile work environment, under Title VII, *see* 42 U.S.C. §§ 2000e-29(a)(1), 2000e-3(a), and the Florida Civil Rights Act ("FCRA"), *see* Fla. Stat. § 760.10(1)(a), (7). After careful review of the record and the parties' briefs, we affirm in part and vacate and remand in part.

**I.**

Because this is an appeal from a grant of summary judgment, we recite the evidence in the light most favorable to Weatherly, the non-moving party. *Buckley v. Sec'y of Army*, 97 F.4th 784, 792 (11th Cir. 2024). The actual facts may or may not be as stated.

Weatherly, a white woman of Russian national origin, worked as a logistics specialist at ABC Legal's local office in Dania Beach, Florida, from approximately August 24, 2017, to November

1, 2017.  ABC Legal is a company based in Seattle, Washington, that provides nationwide service of process.

When Weatherly was hired, the Dania Beach office had two other full-time employees.  Carlos Melo (Hispanic) was the office manager and Weatherly's direct supervisor.  Melo oversaw day-to-day management of the office and handled all employee leave requests.  Konya Robinson (Black) managed and distributed assignments to the process servers.  For her part, Weatherly's job responsibilities included scanning incoming documents, sorting documents for process servers, and other document processing.  Both Melo and Robinson had worked at the local office for several years.

Because their offices were close together, Weatherly often overheard conversations between Melo and Robinson, as well as conference calls between Melo and Seattle headquarters.  According to Weatherly, Melo was often angry or upset after conference calls, and he and Robinson would vent about managers at headquarters.  They complained that the managers were "just there because . . . they were white," and that Melo and Robinson were more deserving but were being kept in "financial slavery."

Meanwhile, Weatherly observed that Robinson, in distributing service assignments, was favoring a new African-American process server over two longstanding white process servers.[1]  And

---

[1] The record shows that process servers were assigned to particular zip codes and that ABC Legal's internal systems automatically assigned service tasks to the process server covering the area at issue.  But company employees confirmed that, at the time Weatherly was hired, Robinson had the power to

Robinson eventually had a meeting with the two white process servers and told them there was "no more work for them to do." According to Weatherly, Robinson disliked the two white process servers and made mean and profane comments about them. She also told Weatherly about a prior process server who Robinson forced out by reassigning her work. Weatherly believed that Robinson was trying to force out the two white process servers in the same way.

Hurricane Irma forced the Dania Beach office to close for several days in September 2017. During the closure, Weatherly called Nadya Onishchenko at Seattle headquarters, who oversaw process-server operations on the East Coast, to report what she felt was discrimination by Robinson, against the two white process servers, in distributing assignments.

When the Dania Beach office reopened, Onishchenko informed Melo during a conference call that the company was removing control over process servers from local offices and centralizing operations in Seattle. That change had the effect of removing many of Robinson's responsibilities, and it caused angry complaints from Melo and Robinson, who referred to upper management as "gringos."

Melo and Robinson were "furious," and they blamed Weatherly for the workflow changes. Melo openly stated that

---

reassign service tasks, though not without creating a record in ABC Legal's internal systems.

"there must be a snitch at the office," pointing at Weatherly. They began to ignore her and "stop[ped] talking" openly around her, whispering instead.  Melo also tasked Robinson with scanning thousands of pages of documents that were years old and scheduled to be thrown away.

Then, soon after the snitch remark, Weatherly went out for her lunch break and discovered that her car had been "smothered with dog feces."  For the next couple days, Weatherly noticed Melo and Robinson laughing together, but they stopped whenever they saw her.  A few days after the dog-feces incident, Weatherly's tires were slashed while she was at work.  Weatherly believed that Melo was responsible for these incidents because he owned two large dogs, he knew what kind of car she drove from her parking permit application, and she did not know of anyone else who would have targeted her.

These incidents also coincided with Melo's and Robinson's changes in demeanor.  According to Weatherly, they became "more aggressive" in relation to upper management, lashing out after every conference call amid concern for Robinson, who "had nothing to do," according to Weatherly.  Weatherly testified that, after a conference call between Melo and managers in Seattle, including Onishchenko, Melo called Onishchenko a "stupid bitch" and claimed that "all the Russians are prostitutes that blow their bosses under the table."  Melo knew that Weatherly, like Onishchenko, was Russian.

Weatherly called Onishchenko a second time to report the incidents involving her car and Melo and Robinson's comments about management.  Onishchenko referred Weatherly to Jenny Davis, the company's director of human resources.  When Weatherly spoke with Davis, she described Melo's "snitch" comment in relation to her report of discrimination and his ensuing hostility to her, the two incidents involving her car, and Melo's lewd comment about Russian women.  Davis said that she would look into it and get back to Weatherly but never did.

Meanwhile, Weatherly began to experience more severe health problems, in particular an adverse reaction to breast implants.  That reaction caused Weatherly arthritis-like symptoms. Dust from nearby construction that came into the office also aggravated her condition.  Weatherly claims that Melo refused to grant her leave requests to see physicians for these issues during work hours.

Near the end of October 2017, Weatherly was trying to arrange for the removal of her breast implants.  She emailed Betty Mirkovich in human resources on October 30 to ask about taking medical leave.  Weatherly wrote,

> Wanted to ask you this: I have an unplanned surgery scheduled for some time soon, could be tomorrow or next month due to a health issue that recently came up.

> Does the company pay medical leave? If I go for the surgery, will I be able to keep the job?

23-11143                Opinion of the Court                7

Mirkovich replied the same day,

> I'm sorry to learn you're having health issues.
>
> Paid medical leave falls under PTO.  You would use your available PTO during your absence.  To be eligible for FMLA leave (which includes job protection) an individual must be employed for at least 12 months.
>
> Depending on the length of your absence and the needs of the company, your position may be held until you return.
>
> Please let me know when you have more information.

On October 31, Weatherly responded with a description of her symptoms and complained of dust in the office, but she did not provide any additional details of the length of her possible absence. Mirkovich forwarded this email to Davis, who had Mirkovich contact Melo about testing air quality in the building.

Then, on November 1, Weatherly sent an email to Melo and Mirkovich with the subject "medical leave."  The email stated,

> Unfortunately due to health issues I have to take a break from work.  In the last month I developed a severe form of arthritis in the entire body (possibly due to implants disease) which makes it impossible to work.

> I just got a call that I'm scheduled for a surgery within the next couple days and now will be resting and preparing for it.
>
> Thank you for your assistance with everything,
>
> The office key is on the table and the computer password is: [omitted]

Before sending this email, Weatherly did not discuss with Melo her need for a medical absence or the length of any such absence.

The next day, November 2, Mirkovich forwarded Weatherly's email to Davis and another member of human resources, stating, "I spoke with [Melo] and [Weatherly] quit yesterday." Melo also emailed Davis to report that Weatherly "quit yesterday afternoon (due to health reasons)" and to ask if he could fill her position. No one contacted Weatherly about her intentions or told her she was terminated. The surgery eventually took place in February 2018.

On November 9, Weatherly learned that she had lost her job, after she was unable to access funds from an employer-sponsored flexible spending account. She called Mirkovich, stating that she was not aware her employment was terminated and that she believed Mirkovich's October 30 email was authorization for her to take leave. Weatherly also claimed she spoke to Melo a few times about her situation, and she would be able to return to work within a few days of her surgery. Mirkovich recounted this conversation in an email to Melo and Davis on November 13, concluding that it "[l]ooks like there was miscommunication by all

involved." Melo responded and denied speaking with Weatherly about her leave or being aware of her surgery apart from her November 1 email. Mirkovich replied that she would "print the emails for [Weatherly's] file and call it good." ABC Legal's records reflect that Weatherly voluntarily terminated her employment for "personal/family" reasons.

## II.

After filing a charge of discrimination with federal and state employment-discrimination agencies, Weatherly brought this lawsuit in federal court. Her second amended complaint raised claims, under both Title VII and the FCRA, of race and national-origin discrimination, retaliation, and hostile work environment.

The district court granted ABC Legal's motion to dismiss the second amended complaint in part, concluding that Weatherly failed to sufficiently allege a claim for hostile work environment. The court permitted the remaining claims to go forward. Then, following discovery, ABC Legal moved for summary judgment on the remaining claims.

The district court granted summary judgment to ABC Legal. In the court's view, Weatherly could not establish a prima facie case of discrimination because the evidence did not show that she suffered an adverse employment action. Rather, the court stated, "a reasonable person in ABC Legal['s] position would have understood that [Weatherly] voluntarily resigned." The court also found that Robinson, her alleged comparator, was not similarly situated or treated more favorably based on race. Next, the court

reasoned that, because Weatherly "did not suffer any adverse employment actions," she could not establish a prima facie case of retaliation. While the court noted that "the scope of the adverse action element is broader in retaliation cases than in discrimination cases," it did not conduct a separate analysis for the retaliation claims and instead cited its discussion on the discrimination claims. The court declined to consider the merits of the national-origin discrimination claims, finding that they were unexhausted.

## III.

We review the grant of summary judgment *de novo*. *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). Summary judgment is appropriate if there is no genuine dispute of material fact, viewing evidence in the light most favorable to the non-movant. *Id.* A genuine issue exists if a reasonable jury could return a verdict for the non-movant. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284–85 (11th Cir. 1997). But "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

We review *de novo* the district court's grant of a motion to dismiss for failure to state a claim, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008) (quotation marks omitted).

## IV.

### A. Discrimination Claims

Title VII and the FCRA prohibit employers from making employment decisions based on race or national origin, among other protected grounds.[2]  *See* 42 U.S.C. § 2000e-2(a)(1); Fla. Stat. § 760.10(1)(a).  When a discrimination claim is based on circumstantial evidence, as it is here, we ordinarily apply the *McDonnell Douglas*[3] burden-shifting framework.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005); *see Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) ("[D]ecisions construing Title VII apply to the analysis of FCRA claims.").

Under that framework, the plaintiff must first establish a prima facie case of discrimination by showing that (1) she belonged to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified for the job, and (4) her employer treated similarly situated employees outside her class more favorably. *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 (11th Cir. 2023). The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  *Id.*  If the employer does so, "the employee must then show that the employer's stated reason was merely a pretext for unlawful discrimination," *id.*, which

---

[2] The parties dispute whether Weatherly properly exhausted her claims of national-origin discrimination at the agency level before filing suit in federal court.  Because it makes no difference to the ultimate outcome, we assume without deciding that Weatherly's charge of discrimination was broad enough to cover national-origin discrimination as well as race discrimination.

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

merges with her ultimate burden of proving that she has been the victim of intentional discrimination, *id.* at 1323.

Alternatively, a plaintiff may defeat a summary-judgment motion outside the *McDonnell Douglas* framework by presenting "a convincing mosaic" of circumstantial evidence that raises a reasonable inference that the employer discriminated against her. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019). Regardless, "the crux of the analysis at the summary judgment stage is whether the plaintiff has offered sufficient evidence to establish a genuine issue of discrimination." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1240 (11th Cir. 2016).

The district court concluded that Weatherly did not make out a prima facie case of discrimination because she failed to show an adverse employment action or that a comparator outside her class was treated more favorably. Weatherly challenges both points, arguing that there is a factual dispute about she whether voluntarily quit or was terminated after attempting to take medical leave, and that the evidence shows Robinson was a similarly situated employee who was treated more favorably.

But even assuming Weatherly did enough to create a prima facie case of discrimination, summary judgment was still appropriate. *See Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1236 & n.5 (11th Cir. 2004) (concluding, as an independent ground for affirming the grant of summary judgment, that the plaintiff had not established pretext, regardless of the district court's prima facie analysis). ABC Legal met its burden of proffering a legitimate

nondiscriminatory reason for Weatherly's termination—that it reasonably believed she had quit for personal or medical reasons. So the burden shifted to Weatherly to present evidence of pretext in that rationale and other evidence sufficient to create "a triable issue concerning the employer's discriminatory intent." *Quigg*, 814 F.3d at 1240 (quotation marks omitted).

Here, the record, construed in the light most favorable to Weatherly, does not permit a reasonable inference of race or national-origin discrimination in relation to Weatherly's termination. In particular, Weatherly has not shown that ABC Legal's legitimate nondiscriminatory reason for terminating her employment—it believed she quit—was pretextual.

In reviewing for pretext, "[w]e do not sit as a super-personnel department that reexamines an entity's business decisions." *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022) (quotation marks omitted). The question is not whether the employer's actions were prudent, fair, or wise, but rather whether they were motivated by discrimination. *Id. see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). "[T]o show pretext, [the plaintiff] must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez*, 610 F.3d at 1265. If the evidence shows that the employer took action for "non-discriminatory reasons, even if

mistakenly or unfairly so, the employer is entitled to summary judgment." *Owens*, 52 F.4th at 1338 (quotation marks omitted).

Undisputed evidence shows that Weatherly had not obtained approval for any medical leave from her supervisor, Melo, or from human resources, when she sent the November 1 email stating that she "ha[d] to take a break from work." Although Weatherly had raised the issue of taking medical leave in an email to Mirkovich in human resources on October 30, Mirkovich's response does not reflect any approval or disapproval. Rather, Mirkovich responded with general information about company leave policies and FMLA job-protection rights, advised that "[d]epending on the length of your absence and the needs of the company, your position may be held until you return," and invited Weatherly to "let me know when you have more information."

But as the district court stated, "[r]ather than providing more information and requesting leave in accordance with the Employee Handbook, [Weatherly] *told* Mr. Melo and Ms. Mirkovich that she was taking medical leave." On November 1, without prior notice to her direct supervisor, she sent an email stating that health issues had "ma[de] it impossible to work." Again, she did not provide any details of her absence, beyond stating that she was "scheduled for a surgery within the next couple days and now will be resting and preparing for it." She concluded the email by stating, "Thank you for your assistance with everything. The office key is on the table and the computer password is: [omitted]." And she

did not contact anyone at ABC Legal for more than a week after sending this email.

Even assuming ABC Legal was mistaken about Weatherly's intent, it had reasonable grounds to conclude that she had voluntarily quit. Instead of pursuing approval for leave through the company, Weatherly abruptly announced that she was taking a break of unspecified length from work, she surrendered control of her office keys and computer password, and she ceased working without further contact for several days. These actions were consistent with voluntary termination of the employment relationship by Weatherly.

Weatherly's evidence does not cast doubt on this rationale. *See Alvarez*, 610 F.3d at 1265. Weatherly claims in her briefing that, after the November 1 email, Melo falsely told human resources that she had quit, since "[s]he had, in fact, told Melo that it was going to be a quick surgery and that she would return within the week." But her testimony does not identify any communications with Melo on these issues apart from her November 1 email. And the November 1 email does not indicate the length of any possible absence, nor when the surgery would occur. What's more, Weatherly otherwise testified that around this time, due to hostility from Melo in the office and her lack of "respect for him as an individual and as a manager, [she] was only communicating with the higher management of the company."

Weatherly also suggests that ABC Legal should have contacted her if her November 1 email was ambiguous, or it should

have retracted her termination once it found out that she had not intended to quit. But "we do not sit as a super-personnel department that reexamines an entity's business decisions." *Owens*, 52 F.4th at 1338. And ABC Legal's failure to follow up with Weatherly does not contradict its asserted belief that she had quit.

Finally, Weatherly relies on derogatory comments Melo made about white and Russian people, as well as Melo's allegedly more favorable treatment of Robinson. But this evidence is insufficient to create a "convincing mosaic" of circumstantial evidence that raises a reasonable inference that ABC Legal discriminated against her. *See Lewis*, 934 F.3d at 1185. As we just explained, Weatherly has not established pretext in the employer's rationale, and there is no evidence that Melo took any action to terminate her apart from telling human resources that, in his view, she had quit. So under these circumstances, Melo's comments, unrelated to the circumstances of Weatherly's termination, are not sufficient to raise a genuine issue of material fact. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) (stating that "comment[s] unrelated to a termination decision" will usually not be enough to establish a triable issue of fact "absent some additional evidence supporting a finding of pretext"). Nor does the evidence reflect any comparable situation involving Robinson that would permit an inference of discrimination in this case. *See Lewis v. City of Union City*, 918 F.3d 1213, 1226–27 (11th Cir. 2019) (*en banc*) (explaining that a valid comparator ordinarily is someone who engaged in the same basic conduct as the plaintiff).

For these reasons, we affirm the grant of summary judgment to ABC Legal on Weatherly's Title VII and FCRA claims of race and national-origin discrimination.

### B. Retaliation Claims

Title VII and the FCRA prohibit an employer from retaliating against an employee because the employee "opposed any practice" made unlawful by those statutes. 42 U.S.C. § 2000e-3(a); Fla. Stat. § 760.10(7). To state a retaliation claim, the plaintiff must establish that she engaged in protected activity and suffered an adverse employment action, and "that the adverse employment action was causally related to the protected activity." *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *see id.* at 1389 ("[D]ecisions construing Title VII guide the analysis of [retaliation] claims under the Florida Civil Rights Act.").

Importantly, "Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (quotation marks omitted). It covers not only "employment-related actions" to retaliate, but also "actions not directly related to [the plaintiff's] employment" and "causing [the plaintiff] harm *outside* the workplace." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 63–64 (2006). In other words, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 67. Retaliatory conduct, whatever its form, is actionable so long as "it well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination." *Monaghan*, 955 F.3d at 861 (quotation marks omitted).

At the outset, we note that Weatherly's second amended complaint raised claims, under both Title VII and the FCRA, alleging traditional retaliation (Counts III, VII), and a hostile work environment based in part on "her opposition to unlawful employment practices" (Counts IV, VIII). As we recognized in *Buckley*, though, "retaliatory-hostile-work-environment claims are really retaliation claims rather than hostile-work-environment claims." 97 F.4th at 799 (cleaned up). And importantly, they are governed by "the retaliation standard" rather than the "severe or pervasive" standard applicable to hostile-work-environment claims based on race or national origin. *Id.* Because both sets of Weatherly's retaliation claims appear to be based on the same facts and circumstances, and are subject to the same standard, we consider all her retaliation claims together.

Here, the district court erred in evaluating Weatherly's retaliation claims. The retaliation claims covered both employment-related conduct (such as adding work assignments and terminating her employment), and non-employment-related conduct (such as calling her a "snitch" after her alleged protected activity, isolating her at the office, and defacing her car). In particular, Weatherly argued at summary judgment, as she does on appeal, that she suffered adverse actions both within and outside the workplace under the more lenient retaliation standard.

The district court reasoned that, because Weatherly did not suffer an adverse action for her discrimination claim, she could not establish an adverse action for her retaliation claims. But as the court itself noted, "the scope of the adverse action element is broader in retaliation cases than in discrimination cases." Doc. 131 at 20. That said, the court did not address whether the challenged conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," even if she voluntarily resigned. *See Monaghan*, 955 F.3d at 861. Nor has ABC Legal separately addressed the retaliation standard in its briefing on appeal.

So we vacate and remand for the district court to apply the proper standard for retaliation claims.[4] *See Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1209 (11th Cir. 2021) ("[W]e think it best for the district court to have the chance to evaluate Babb's claim under the proper [retaliation] standard."). Nevertheless, we agree with the district court to that extent that Weatherly cannot proceed on a retaliation claim in relation to her termination. For the reasons we've already explained with regard to her claims of

---

[4] ABC Legal complains that Weatherly's claims are based almost entirely on her own self-serving uncorroborated testimony. But our precedent is clear that an affidavit that satisfies Rule 56 and is based on personal knowledge "may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated." *United States v. Stein*, 881 F.3d 853, 854 (11th Cir. 2018) (*en banc*). "The same principle, of course, applies to a witness' first-hand account provided at a deposition." *Williams v. Radford*, 64 F.4th 1185, 1198 (11th Cir. 2023).

discrimination, Weatherly has not established pretext in the employer's legitimate, nonretaliatory reason for her termination—that it reasonably believed she had quit. *See Ring v. Boca Ciega Yacht Club, Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (evaluating a retaliation claim under the *McDonnell Douglas* burden-shifting framework and affirming the grant of summary judgment for failure to establish pretext).

For these reasons, we vacate the grant of summary judgment on Weatherly's retaliation claims and remand for further proceedings consistent with this opinion.

### C.  Hostile-work-environment Claims

Finally, we consider the district court's dismissal of Weatherly's hostile-work-environment claim under Federal Rule of Procedure 12(b)(6).  Weatherly maintains that the district court erred by failing to apply the pleading standard announced in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), which held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," and that her allegations were sufficient to state a claim.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, which, accepted as true, states a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires

more than labels and conclusions . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The plaintiff must "set out enough factual content to allow a court to draw the reasonable inference" that the defendant is liable for the discrimination alleged. *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1023 (11th Cir. 2016) (cleaned up).

To plead a claim for hostile work environment, the plaintiff generally is required to allege that (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis exists for holding the employer liable. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010); *see also Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The requirement that the harassment be "severe or pervasive" contains an objective and a subjective component. *Miller*, 277 F.3d at 1276. In evaluating the objective severity of the harassment, courts consider the following: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* Because Title VII is not intended to be "a federal civility code," simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of

employment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*) (quotation marks omitted).

Here, the district court did not err in dismissing the hostile-work-environment claim for failure to state a plausible claim. For starters, the court did not apply the wrong pleading standard. We have long recognized that *Twombly* "categorically retired" *Conley*'s more lenient pleading standard. *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 714 (11th Cir. 2014).

Plus, Weatherly has not shown that the district court erred in evaluating her allegations. The court found that Weatherly's operative second amended complaint failed to sufficiently connect the "offensive language and epithets such as those allegedly used by Mr. Melo and Ms. Robertson" to any of the factors courts use to assess whether the challenged conduct is "severe or pervasive." In particular, the court reasoned that Weatherly offered only "conclusory allegations" as to the frequency and severity of the conduct, whether the conduct was physically threatening or humiliating, or whether it interfered with Weatherly's job performance.

We cannot say the district court erred in finding that Weatherly's allegations failed to make a plausible showing that the workplace harassment on account of race or national origin was so severe or pervasive as to alter the terms and conditions of her employment. *See Edwards*, 602 F.3d at 1300. The Supreme Court has "made it clear that conduct must be *extreme* to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). And the factual allegations fail

to suggest that the harassment went beyond the sporadic use of offensive or crude language in a workplace, which does not amount to an abusive working environment that alters the terms and conditions of employment. *See Mendoza*, 195 F.3d at 1245. For instance, Weatherly did not allege that Melo and Robinson made objectionable comments to or about her. *See Miller* 277 F.3d at 1277 (reasoning that offensive language was more severe because it was directed at the plaintiff "in an intimidating manner"). We therefore affirm the dismissal of Weatherly's hostile-work-environment claims based on her race and national origin.

Nonetheless, as we explained in our discussion of Weatherly's retaliation claim, a different standard applies for retaliatory harassment. *See Monaghan*, 955 F.3d at 860–61. So to the extent that the district court reviewed Weatherly's retaliatory hostile work environment allegations under the "severe or pervasive" standard applicable to hostile-work-environment claims based on race or national origin, it erred. *See Buckley*, 97 F.4th at 799. We therefore vacate the dismissal of Weatherly's retaliatory hostile-work-environment claims, and we remand for the court to apply the proper retaliation standard.

## V.

To recap, we affirm for other reasons the district court's grant of summary judgment on Weatherly's claims of race and national-origin discrimination. We also affirm the dismissal of her claims alleging a race-based or national-origin-based hostile work environment. But we vacate the grant of summary judgment on

her retaliation claims, and we remand for the district court to apply the proper retaliation standard for adverse actions.

**AFFIRMED in part; VACATED and REMANDED in part.**