[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10383

_____

NORIS BABB,

Plaintiff-Appellant,

*versus*

SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:14-cv-01732-VMC-TBM

_____

Before JILL PRYOR, NEWSOM, and LAGOA, Circuit Judges.

PER CURIAM:

In 2014, Norris Babb, a federal employee, sued the Secretary of the Department of Veterans Affairs, alleging sex and age discrimination, retaliation, and retaliatory hostile work environment pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-16(a), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626. After a series of intervening decisions and appeals, the district court granted summary judgment in favor of the Secretary on Babb's sex and age discrimination claims. Babb's Title VII retaliation claim and retaliatory hostile work environment claim proceeded to a jury trial and the jury returned a verdict for the Secretary on both claims.

On appeal, Babb argues that the district court (1) misapplied the federal-sector employment causation standard for discrimination and retaliation claims outlined in *Babb v. Wilkie*, 589 U.S. 399 (2020) ("*Babb I*"), and *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193 (11th Cir. 2021) ("*Babb II*"), in its ruling on summary judgment, and (2) abused its discretion in its jury instructions. After carefully considering the parties' arguments and with the benefit of oral argument, we affirm the judgments below.

## I.    FACTUAL BACKGROUND

Noris Babb joined the C.W. Bill Young VA Medical Center ("VA") in 2004 as a clinical pharmacist under the auspices of the VA's Pharmacy Services division. In 2006, Babb became a pharmacist in the Geriatrics Clinic at the VA, where she worked until June 2013. During her tenure in Geriatrics, Babb worked as a member

of an "interdisciplinary team" of caregivers. Babb's role and responsibilities were governed by a service agreement between Pharmacy Services and Geriatrics. As such, Babb had two sets of supervisors: Dr. Leonard Williams, Chief of the Geriatrics Clinic, and several Pharmacy Services administrators, including (1) Dr. Gary Wilson, Chief of Pharmacy Services; (2) Dr. Marjorie Howard, Babb's Pharmacy Services direct supervisor; (3) Dr. Keri Justice, Associate Chief of Pharmacy Services; and (4) Dr. Robert Stewart, the Clinical Pharmacy Supervisor.

In 2009, Babb obtained an "advanced scope," which meant she could practice "disease state management" ("DSM"). As a DSM practitioner, Babb could independently manage patients for certain conditions within the scope of her expertise—diabetes, hypertension, and lipids—without having to consult a physician. In 2011, the VA implemented a new nationwide patient-care system, "Patient Aligned Care Team" ("PACT"), which emphasized "continuity of care," and required each team member to "work[] at their highest…licensed capacity" to provide optimal medical care for patients. Under PACT, GS-12 pharmacists who practiced DSM at least 25% of the time would be eligible for promotion to GS-13. As a GS-12 with an advanced scope enabling her to practice DSM, Babb naturally sought promotion to GS-13.

During this period (2011–2012), Babb, along with several other women, began to suspect that Pharmacy Services was implementing the new qualification standards for promotion in a manner that discriminated on the basis of sex and age. Ultimately, two

clinical pharmacist colleagues of Babb, Donna Trask and Anita Truitt, filed EEOC complaints in October 2011, which culminated in their filing an age and sex discrimination lawsuit against the Secretary in February 2013. Babb supported her colleagues' allegations, first by providing statements to an EEOC investigator in April and May of 2012, and then, by providing deposition testimony in March 2014.[1] According to Babb, her "whole career…changed" and "took a turn in a bad direction" after "participat[ing]" in Trask and Truitt's case against the Secretary.

In June 2012, Howard, Babb's direct supervisor, asked whether Babb would consider transferring to a vacant primary care position in "Module B." Howard recommended Babb's transfer because she did not think that Babb could satisfy the 25% requirement for the GS-13 promotion if she stayed in the Geriatrics Clinic. But Babb declined. She explained that treating geriatrics was her professional calling and that she remained hopeful that she could see additional patients and thereby satisfy the new promotion criterion. Notably, around this same time, Natalia Schwartz, a younger female pharmacist, requested transfer to the Module B vacancy, but

---

[1] In April 2016, we affirmed a federal district court's grant of summary judgment for the Secretary. *See Trask v. Sec'y, Dep't of Veterans Affs.*, 822 F.3d 1179, 1184 (11th Cir. 2016). But, as discussed below, in *Babb II* we held that our decision in *Trask* was abrogated by the Supreme Court's decision in *Babb I*. *See Babb II*, 992 F.3d at 1196, 1200–04 (11th Cir. 2021).

Pharmacy Services denied her request after deciding not to fill the position.

About two months later, in August 2012, the service agreement between Pharmacy Services and Geriatrics was up for renegotiation. Both Pharmacy Services and Geriatrics initially explored the possibility of having Babb remain in Geriatrics and spend at least 25% of her time using her advanced scope to practice DSM. But such an arrangement was ultimately viewed as unworkable. Babb's Geriatrics supervisor, Williams, concluded that (1) reserving 25% of Babb's time for DSM would detract from Babb's primary job as a clinical pharmacist and increase wait times for patients, and (2) DSM was not well-suited for geriatric patients. Williams determined that Geriatrics could only provide Babb with three slots per day to practice DSM, but that would fall short of the requisite 25% to receive a GS-13 promotion. Accordingly, the executed service agreement did not provide for Babb to practice DSM. Instead, Babb was to spend her time working as a clinical pharmacist as part of an integrated patient-care team, which was Williams's preference.

Because Babb would no longer practice DSM under the renegotiated service agreement, Pharmacy Services initiated the process to remove Babb's advanced scope, which was completed in February 2013.

Around the time of the renegotiation of the service agreement, Babb's increasing concern that she would not be able to practice DSM in Geriatrics led her to ask about opportunities in the VA's anticoagulation clinic. To facilitate her potential transfer, Babb

requested anticoagulation training. But Pharmacy Services denied her request. Pharmacy Services explained that (1) the anticoagulation clinic was responsible for training medical residents, (2) it was understaffed and did not have the capacity to train others, and (3) such training was irrelevant to Babb's work in Geriatrics anyway. Babb was denied the same request in January 2013. Notably, Pharmacy Services denied similar requests from other pharmacists as well.

In April 2013, two positions opened in the anticoagulation clinic. Seizing on the opportunity to transfer out of Geriatrics, Babb applied. A three-member panel comprising Kim Hall, Catherine Sypniewski, and Robert Stewart conducted interviews for the two positions. The panel ultimately selected Sara Grawe (age 26) and Amy Mack (age 30), two younger female pharmacists who scored highest on the interview.

Babb admitted that her interview went poorly due to "anxiety and stress" and that it was "the worst interview of [her] life." The panel's testimony corroborates Babb's recollection. Hall remembered that Babb used unprofessional language (like "crap" and "screwed up") and harshly criticized her colleagues. This made Hall question whether Babb was a good fit for the anticoagulation clinic, which prioritized communication skills. Sypniewski explained that Grawe and Mack possessed significantly more anticoagulation experience—Babb had none—and provided better answers to difficult medical questions. And Stewart echoed Sypniewski's assessment that Babb's anticoagulation experienced was

"nowhere near" the selected applicants.  The panelists awarded Babb 39 points, falling far short of Grawe and Mack, who received scores of 52 points and 62 points, respectively, in part because they had a "significant amount" of training "in the anticoagulation clinic."

That same April, as Babb was interviewing for the anticoagulation position, Wilson, Chief of Pharmacy Services, received an anonymous "vulgar" letter critical of Pharmacy Services' promotion practices for employees between GS-11 and GS-13.  Pharmacy Services convened an administrative investigation board ("AIB") to investigate and uncover the letter's author.  Justice, Associate Chief of Pharmacy Services, testified to the AIB that (1) Babb was one of the "mow-wows," i.e. "squeaky wheels," who are "never happy, always complaining," and (2) certain employees perceived that "they were discriminated against because they were older and female." Wilson also testified to the AIB that Babb "felt that [she was] discriminated against over age and sex."  Ultimately, Babb was questioned in connection with the letter along with 25 other employees.

Around this same time, Babb also requested a transfer to the Module B position that she had declined back in June 2012, in the hope that working in Module B would allow her to once again practice with an advanced scope and achieve a GS-13 promotion. Justice denied Babb's request, explaining that (1) Pharmacy Services had decided not to fill that vacancy, and (2) she could not transfer Babb to a position with promotion potential without

advertising the position and allowing for a competitive application process.

In May 2013, after failing to secure either the anticoagulation or Module B positions, Babb filed the EEOC complaint that resulted in this lawsuit. She also requested transfer to the "float pool," where she could be part of a group of rotating pharmacists filling in for absent staff. Practicing as a "floater" did not require an advanced scope and presented no promotion opportunities, but at this point Babb simply wanted out of Geriatrics. Pharmacy Services approved Babb's request, and she joined the float pool in July 2013.

After Babb spent several months working as a floater, another two GS-13 positions opened up. The first was a PACT assignment split between Module B and Module D, and the second was a half anticoagulation and half Palm Harbor clinic position. In March 2014, Babb accepted the PACT assignment, and in April 2014, Justice submitted the paperwork to facilitate Babb's GS-13 promotion. Babb's promotion was approved in August 2014.

Despite the promotion, Babb was unhappy that her new job—which consisted of four 9-hour shifts Tuesday through Friday and one 4-hour shift on Saturday mornings—only entitled her to four hours holiday pay for each of the five Monday federal holidays. The VA offered to change her schedule (by shifting her Saturday work to other days) so that she could receive a full eight hours of holiday pay on those five Mondays, but Babb declined because the Saturday hours came with additional pay.

## II.    PROCEDURAL HISTORY

In 2014, Babb sued the Secretary of the Department of Veterans Affairs, alleging retaliation, sex and age discrimination, a hostile work environment, and a retaliatory hostile work environment under Title VII and the ADEA. The Secretary moved for summary judgment, which the district court granted in full.

Babb appealed the district court's decision, and we reversed and remanded on Babb's sex discrimination claim but affirmed the district court's other rulings. *See Babb v. Sec'y, Dep't of Veterans Affs.*, 743 F. App'x 280 (11th Cir. 2018). We concluded that the district court erred by applying the *McDonnell Douglas* framework to Babb's sex discrimination claim instead of the more lenient "motivating factor" standard, which we stated in *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016) applies to a "mixed-motive" claim— when a plaintiff alleges that an employer engaged in an adverse personnel action for a combination of discriminatory and non-discriminatory reasons. *Id.* at 286–87. But we rejected Babb's argument that the *Quigg* standard also applied to her age discrimination and retaliation claims. We acknowledged that "if we were writing on a clean slate, we might well agree," but that we were bound by our precedent in *Trask*, which applied the *McDonnell-Douglas* framework to such claims. *Id.* at 287–88. We also concluded that the district court properly evaluated and rejected Babb's hostile work environment claims under *Gowski's* "severe and pervasive" standard. *Id.* at 291–92.

Babb then petitioned the Supreme Court, which granted certiorari on one issue: whether the federal-sector provision of the

ADEA required her to prove that age was a "but-for" cause of an adverse personnel action. *Babb I*, 589 U.S. at 402. The Supreme Court ruled for Babb, explaining that the plain language of § 633(a) of the ADEA, which mandates that "personnel actions…shall be made free from any discrimination based on age…", requires a plaintiff to show only that "age discrimination plays any part in the way a decision is made." *Id.* at 405–08. Imposing this looser causation standard ensures that personnel actions are "untainted by any considerations of age" regardless of whether such considerations would have changed the outcome. *Id.* at 402.

But the Supreme Court made clear that a plaintiff must still show "that age was a but-for cause of differential treatment" that ultimately played a part in the adverse employment outcome. *Id.* at 414. And the Supreme Court also explained that "plaintiffs who demonstrate only that they were subjected to [differential treatment] cannot obtain reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision." *Id.* at 413. To obtain such remedies, "plaintiffs must [still] show that age discrimination was a but-for cause of the employment outcome." *Id.*

Following the Supreme Court's decision, we reversed and remanded on Babb's age and sex discrimination claims but otherwise affirmed the district court. *See Babb v. Sec'y, Dep't of Veterans Affs.*, 802 F. App'x 548 (11th Cir. 2020). Babb petitioned for a rehearing on two issues: (1) whether the Supreme Court's decision extended to Babb's retaliation claim and (2) whether our intervening

decision in *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020) undermined our previous rejection of Babb's retaliatory hostile work environment claim. *Babb II*, 992 F.3d at 1195.

We granted her petition and answered in the affirmative on both issues. *Id.* at 1195–96. Because the ADEA's federal-sector provision was "nearly identical" to Title VII's retaliation provision—both containing the "shall be made free from any discrimination" language—we held that the Supreme Court's decision abrogated our holding in *Trask* and that the district court must reassess Babb's retaliation claim under the new framework outlined by the Supreme Court. *Id.* at 1199–1205. We reasoned that "[w]ithout quite saying as much…it seems that the Supreme Court accepted Babb's argument 'that the District Court should not have used the *McDonnell Douglas* framework.'" *Id.* at 1204 (quoting *Babb I*).

As to Babb's retaliatory hostile work environment claim, we explained that our decision in *Monaghan*—which held that a retaliatory hostile work environment claim is a subset of a retaliation claim rather than of a hostile work environment claim—undermined *Gowski*, which had analyzed retaliatory hostile work environment claims under the "severe or pervasive" standard appropriate for hostile work environment claims. *Id.* at 1205–08. Instead, we held that retaliatory hostile work environment claims should be adjudicated based on the "different, less onerous standard" applied to retaliation claims: "whether the employer's complained-of action well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 1206–08. Accordingly, we reversed and remanded to the district court once again,

this time to reevaluate Babb's age and sex discrimination claims, her retaliation claim, and her retaliatory hostile work environment claim. *Id.* at 1209.

After supplemental briefing to address the intervening changes of law, the district court issued a renewed opinion, granting summary judgment for the Secretary on Babb's sex and age discrimination claims, but denying summary judgment on Babb's retaliation and retaliatory hostile work environment claims. Applying the standard outlined in *Babb I* and *II*, the district court found that Babb had not shown that a reasonable jury could conclude from the evidence presented that Babb's age or sex played any role at all in the process leading to the two alleged adverse employment decisions: (1) her non-selection for the anticoagulation position and (2) denial of her request to transfer to Module B. But applying that same "played any role in the decision-making" standard to Babb's retaliation claim, the district court found that a reasonable jury could infer a causal connection between Babb's opposition to alleged discrimination and certain differential treatment she experienced in the decision-making process for several retaliatory personnel actions, including the removal of her advanced scope, denial of her holiday pay, denial of her transfer request to Module B, and her non-selection for the anticoagulation position. As to Babb's retaliatory hostile work environment claim, the district court found that a reasonable jury could conclude that Babb's work environment "might well have dissuaded [her] from making or supporting a charge of discrimination." Babb's Title VII retaliation and retaliatory hostile work environment claims thus proceeded to trial.

Prior to trial, the Secretary moved for partial reconsideration of the district court's order, solely to address an inconsistency between the district court's ruling and one of its prior rulings in the action. In analyzing Babb's retaliation claim, the district court had listed the removal of Babb's advanced scope as one of several actionable discrete retaliatory personnel actions. However, in its prior ruling dismissing Babb's Second Amended Complaint, the district court had held that the removal of Babb's advanced scope could not constitute a discrete act of retaliation because Babb had failed to timely assert it as such to an EEO counselor within the requisite 45-day period. Accordingly, Plaintiffs' Third Amended Complaint—the operative complaint—did not identify the removal of the advanced scope as a discrete act of retaliation. The district court agreed, holding that "[t]he…removal of Dr. Babb's Advanced Scope is…time-barred from consideration as a discrete act," although it could "serve as circumstantial evidence of…retaliatory animus."

An eight-day trial followed. Babb presented testimony from eleven witnesses and deposition testimony. The Secretary presented five witnesses. Collectively, the parties introduced over 100 exhibits.

As relevant to this appeal, the district court instructed the jury that testimony presented by Babb concerning age and sex discrimination experienced by Trask and Truitt was admissible "only for the limited purpose of proving Dr. Babb's good faith belief that

14                    Opinion of the Court                    23-10383

[Trask and Truitt] had been discriminated against and not for any other purpose."

The district court also instructed the jury concerning the causation standard for Babb's retaliation and retaliatory hostile work claims. The district court's instruction for Babb's retaliation claim required proving that "Defendant treated Plaintiff differently during the process of making the adverse employment actions *based on* Plaintiff's EEO activity." Likewise, the instruction for Babb's retaliatory hostile work environment claim required proving that "Plaintiff was subjected to offensive acts or statements about or *because of* her protected EEO activity—even if they were not specifically directed at her…"[2]

The jury returned a verdict for the Secretary on both counts, finding that (1) no one had "treated [Babb] differently during the process of making the adverse employment actions based on [Babb's] EEO activity" and (2) no one had "harassed [Babb] because of her EEO activity."

This appeal timely ensued.

### III.    STANDARD OF REVIEW

---

[2] By contrast, Babb's rejected proposed instruction for her retaliation claim required proving that "Plaintiffs protected activity *was considered* by the Defendant or that it played any role or part in the process of making the personnel action or actions. And her proposed instruction for her retaliatory hostile work environment claim required proving that "Plaintiff's supervisors harassed her *while considering* her protected activities."

23-10383                    Opinion of the Court                    15

We review a grant of summary judgment *de novo*, "viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1351 (11th Cir. 2024) (citation and quotations omitted). And we generally review a district court's refusal to give a jury instruction for abuse of discretion. *Watkins v. City of Montgomery, Ala.*, 775 F.3d 1280, 1289 (11th Cir. 2014). "A district court abuses its discretion by refusing to give a requested instruction 'only when (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party.'" *Id.* at 1291 (quoting *Burchfield v. CSH Transp., Inc.*, 636 F.3d 1330, 1333-34 (11th Cir. 2011) (per curiam)).

## IV.    ANALYSIS

### A. Sex And Age Discrimination Claims

Prior to *Babb I* and *II*, the standard framework for evaluating federal-sector employment discrimination claims was the *McDonnell Douglas* burden-shifting framework. *See Buckley v. Sec'y of Army*, 97 F.4th 784, 794 (11th Cir. 2024). Under this framework, a plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *Id.* Once a *prima facie* case is established, the burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for its actions. *Id.* Assuming it does, the burden then shifts back to the employee to show that the employer's proffered reason is mere pretext. *Id.* In short, under *McDonnell Douglas*, "the

plaintiff bears the ultimate burden to show that discrimination was the but-for cause of her employer's adverse personnel action." *Id.*

We have held that application of the *McDonnell Douglas* test to Title VII and ADEA federal-sector discrimination claims does not "make sense" post *Babb I* and *II*. *Buckley*, 97 F.4th at 794. This is because Title VII's federal-sector provision no longer requires a showing of but-for causation as to the ultimate employment outcome, but "only that a protected characteristic played any part in [the] employer's process in reaching an adverse employment decision." *Id.* Thus, using the *McDonnell Douglas* framework "is like requiring the plaintiff to move a boulder when she need only push a pebble." *Id.*

The framework is "much simpler" now. *Id.* at 795. "In analyzing [a] disparate-treatment claim we return to *Babb I's* directive and simply assess whether [the plaintiff] has proffered evidence that her [protected class] 'play[ed] any part' in the…decision making process" that resulted in the adverse employment decision. *Id.*; *see Terrell*, 98 F.4th at 1352 (holding that under Title VII's federal-sector provision a plaintiff now "must proffer evidence that her race or national origin played any part in the hiring process").[3]

_____

[3] To clarify, to assert a claim for injunctive relief, a plaintiff no longer needs to show but-for causation as to the ultimate employment outcome; but such a showing is still required for monetary damages. *See Babb I*, 589 U.S. at 413–14.

Here, we conclude that the district court correctly found that Babb could not establish that a protected characteristic played any part in the decision-making processes concerning (1) her non-selection for the anticoagulation position and (2) the denial of her transfer to Module B.[4] We turn first to the anticoagulation position.

### 1. Non-Selection For Anticoagulation Position

Babb's argument that she was subjected to differential treatment on the basis of sex or age in her non-selection for the anticoagulation position boils down to two contentions: (1) two younger female pharmacists were selected in her stead and (2) the selection panel awarded additional points to applicants with residency training and residency-trained pharmacists tend to be younger. Neither contention evinces unlawful differential treatment on the basis of sex or age.

First, Babb provides no evidence that age or sex played any role in the selection of Grawe and Mack. Both younger pharmacists, like Babb, were female, and the record conclusively establishes that the interviewing panel selected them because they "had significantly more experience in the applied for position" and that their

---

[4] Because Babb cannot even establish discrimination in the decision-making processes resulting in her adverse employment outcomes, Babb is not eligible for injunctive relief. *See Babb I,* 589 U.S. at 414. And it goes without saying that Babb is also not eligible for monetary relief, as such relief requires showing that alleged discrimination was the but-for cause of an adverse employment decision itself. *See id.* at 413.

experience "indicated…that they should be capable of doing the job in an efficient and skilled manner [and] should require little training to practice independently." Conversely, the interviewers noted that Babb had no anticoagulation experience and had acted unprofessionally during the interview. Indeed, Babb's interview went so poorly that she acknowledged that "it was the worst interview of [her] life."

As for the choice to award additional points to applicants with residency training, the record provides no indication that privileging residency-trained pharmacists was motivated by discriminatory considerations of age or sex. *See Babb I*, 589 U.S. at 406 ("age must be a but-for cause of…differential treatment"). As one member of the selecting panel explained, "a residency should…carry higher points than a board certification [because] a residency is one year of intensive focused training, mentoring, and learning for a pharmacist where they get extensive experience in disease state management" and there is "no substitute for the experience that someone gets in residency when it comes to disease state management advanced scope."

Contrast the panel's awarding of additional points for a residency with the hypothetical the Supreme Court used in *Babb I* to illustrate discriminatory differential treatment in the decision-making process:

> Suppose that a decision-maker is trying to decide whether to promote employee A, who is 35 years old, or employee B, who is 55. Under the employer's policy, candidates for promotion are first given numerical

> scores based on non-discriminatory factors. Candi-
> dates over the age of 40 are then docked five points,
> and the employee with the highest score is promoted.
> Based on the non-discriminatory factors, employee A
> (the 35-year-old) is given a score of 90, and employee
> B (the 55-year-old) gets a score of 85. But employee
> B is then docked 5 points because of age and thus
> ends up with a final score of 80. The decision-maker
> looks at the candidates' final scores and, seeing that
> employee A has the higher score, promotes employee
> A.

*Babb I*, 589 U.S. at 407.

The Supreme Court explained that even though employee A would have had the higher score regardless, docking points from employee B because of his age was still a form of unlawful differential treatment. *Id.* But here, unlike the Supreme Court's hypothetical where there was a direct connection between points awarded and age discrimination, the connection between privileging a residency and any possible discriminatory motivation is pure speculation. And such speculation does not suffice to show that discriminatory differential treatment played a role in an adverse employment outcome per *Babb I* and *II*, which still require proving that age or gender was a "but-for cause of discrimination—that is, of differential treatment." *Babb I*, 589 U.S. at 406; *see Babb II*, 992 F.3d at 1204.

Babb also raises a third argument by pointing to allegations of gender and age discrimination by other women who worked at the VA.  But Babb does not connect any of those general allegations to the specific decision-making process resulting in her non-selection for the anticoagulation position.  Even taking these allegations in the light most favorable to the non-moving party, Babb's inability to tie any of them to the individuals comprising the panel that rejected her renders them immaterial.  *See Buckley*, 97 F.4th at 795 (finding the discriminatory conduct of others irrelevant because they did not participate in the personnel decision and "we can't say the[ir] [actions] bear any direct connection to…the supervisors that decided to remove [plaintiff]").  Indeed, the Supreme Court stressed that any alleged discrimination must play a part "when the actual decision was made," as to hold otherwise would have "startling implications." *Babb I*, 589 U.S. at 408 n.3.  Here, not only does Babb fail to connect any other alleged discrimination to the panel, she fails to show how any other alleged discrimination factored into the panel's decision.

In sum, other than her non-selection despite more qualified candidates, Babb offers no other circumstantial evidence that considerations of age or sex played a part in the panel's decision.  We thus conclude that Babb failed to establish that discriminatory differential treatment tainted the panel's decision-making in filling the anticoagulation positions.  *See Terrell*, 98 F.4th at 1354 (differential treatment did not play a part in non-selection where the selectee "had fourteen years of Nurse Manager experience (compared to [plaintiff's] three) as well as the Nurse Executive certification

(which [plaintiff] lacked)" and the plaintiff provided no other circumstantial evidence of discrimination).  We now turn to Babb's request to transfer to Module B.

### 2. Denial Of Request to Transfer to Module B

On appeal, Babb fails to counter the district court's finding that Babb was not subject to any differential treatment on the basis of age or sex when Pharmacy Services denied her request to transfer to Module B for the simple reason that the Module B position did not exist at the time of Babb's request.  The record evidence establishes that as early as the end of June 2012, Pharmacy Services made the decision not to replace the outgoing pharmacist in Module B and instead service the outgoing pharmacist's patients through existing staff.  And further undermining Babb's assertion of discrimination, the record also shows that shortly after deciding not to fill the Module B vacancy, Pharmacy Services denied a younger female pharmacist's request to transfer to that position on the same grounds it denied Babb—the vacancy simply no longer existed.

Babb also argues that Pharmacy Services' additional justification for its denial of Babb's request—that it could not open up a position with promotional prospects without facilitating a competitive application process—evidences differential treatment because Pharmacy Services had previously made exceptions to this rule.  But as the district court found, Babb does not provide a similarly situated comparator to substantiate her argument.  *See Jenkins v. Nell*, 26 F.4th 1243, 1249–50 (11th Cir. 2022).  Babb's proffered

comparator, Lobley, a 40-year-old male, did not transfer positions; his preexisting position simply evolved due to the implementation of the new PACT initiative in 2011. We thus conclude that Babb and Lobley are not "similarly situated in all material respects." *Lewis I*, 918 F.3d at 1226. Accordingly, we affirm the district court's grant of summary judgment on Babb's sex and age discrimination claims in favor of the Secretary.

### B.  The District Court's Jury Instructions

Lastly, Babb challenges the district court's jury instructions on two grounds. First, Babb argues that the district court's jury instructions misstated the causation standard articulated in *Babb I* and *II* for her retaliation and retaliatory hostile work environment claims. Second, Babb argues that the district court erred by instructing the jury not to consider testimony by Trask and Truitt concerning allegations of sex and age discrimination for any purpose other than establishing Babb's good-faith belief—an element of her retaliation claim—that her colleagues experienced discrimination.

Contrary to Babb's argument, the district court's jury instructions for the retaliation and retaliatory hostile work environment claims, unlike Babb's proposed instruction, correctly laid out the *Babb* causation standard framework. *Babb I* explained that a plaintiff can obtain injunctive relief "if *they show* that age was a but-for cause of differential treatment in an employment decision but not a but-for cause of the decision itself." 589 U.S. at 414 (emphasis added). And we reiterated in *Babb II* that "the [Supreme] Court

expressly clarified that "age must be the but-for cause of differential treatment, not that age must be a but-for cause of the ultimate decision." 992 F.3d at 1204. In other words, a plaintiff must show that alleged differential treatment "based on" protected activity played a role in the decision. *See Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 63 (2007) ("the phrase 'based on' indicates a but-for causal relationship"). That is precisely what the district court's jury instructions given to the jury did, and what Babb's proposed instructions—requiring only that the VA "considered" her protected activities—did not. Because the jury instructions given by the district court accurately stated the law, we conclude that the district court did not abuse its discretion in declining to instruct the jury as Babb requested.

As for Babb's argument that the district court erred by instructing the jury not to consider testimony by Trask and Truitt concerning allegations of sex and age discrimination for any purpose other than establishing Babb's good-faith belief—an element of her retaliation claim—that her colleagues experienced discrimination, we also conclude that the district court did not abuse its discretion in declining to instruct the jury as Babb requested. "We will not disturb the trial judge's discretion unless 'we are left with the substantial and uneradicable doubt as to whether the jury was properly guided during it deliberation.'" *Watkins*, 775 F.3d at 1289–90 (quoting *Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1288 (11th Cir. 1998)). After carefully considering the record and the parties' briefs, we are not left with any doubt let alone "substantial and

uneradicable doubt" as to whether the jury was properly guided during its deliberations.

## V.  CONCLUSION

For the reasons stated, we affirm the district court's grant of summary judgment in favor of the Secretary on Babb's sex and age discrimination claims.  We also conclude that the district court did not abuse its discretion in instructing the jury on Babb's claims.

**AFFIRMED.**